**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| XUCHANG YINREN TECHNOLOGY CO., LTD.,<br><br>Plaintiff,<br><br>v.<br><br>THE PARTNERSHIPS and UNINCORPORATED ASSOCIATIONS IDENTIFIED ON SCHEDULE "A",<br><br>Defendants. | Case No.: 1:26-cv-10328<br><br>**Judge Thomas M. Durkin**<br><br>**Magistrate Judge Laura K. McNally** |

**DECLARATION OF PENGFEI XIA**

I, Pengfei Xia, declare and state as follows:

1. This declaration is based upon my personal knowledge of the facts stated herein or on the business records that were made at the time or in the regular course of business. If called as a witness, I could and would testify to the statements made herein.
2. I am the General Manager of Xuchang Yinren Technology Co., Ltd. ("Plaintiff"), and I am duly authorized to make this declaration on Plaintiff's behalf. I am knowledgeable of or have access to business records concerning all information referenced herein, including, but not limited to, Plaintiff's trademark, other

intellectual property, sales, on-line sales, advertising, marketing, and media coverage. I make this declaration from matters within my own knowledge save where otherwise stated.

3. Propelled by its reputation and recognizable trademarks, which are carefully curated and monitored, consumers recognize Plaintiff and the Plaintiff brands as a source of reliable and quality hair extensions, wigs, hair pieces, and braiding hair (collectively, the "Plaintiff's products"). Plaintiff has registered its trademark with the United States Patent and Trademark Office. Plaintiff's Products typically include at least one of Plaintiff's registered trademark. Plaintiff uses its trademarks in connection with the marketing of its Plaintiff's Products, including the following mark, which is referred to as the "Trademark-in-Suit."

| Registration Number | Trademark |
|---|---|
| 8,311,515 | SUNNY HAIR |

6. The above U.S. registration for the Trademark-in-Suit is on the Principal Register and is valid, subsisting, and in full force and effect. Plaintiff has used the Trademark-in-Suit continuously in United States commerce since at least as early as August 18, 2025.

True and correct copies of the United States Registration Certificate for the above-listed Trademark-in-Suit are attached to the Complaint as **Exhibit A**.

7. The Trademark-in-Suit is distinctive when applied to the Plaintiff's products, signifying to the purchaser that the products come from Plaintiff and are manufactured to Plaintiff's quality standards. Whether Plaintiff manufactures the products itself or contracts with others to do so, Plaintiff has ensured that products bearing the Trademark-in-Suit are manufactured to the highest quality standards.

8. The innovative marketing and product designs of the Plaintiff's products have enabled the Plaintiff's brands to achieve widespread recognition and fame and have made the Trademark-in-Suit some of the most well-known marks in the hair extensions and wigs industry. The widespread fame, outstanding reputation, and significant goodwill associated with the Plaintiff brands have made the Trademark-in-Suit valuable assets of Plaintiff.

9. Plaintiff has expended substantial time, money, and other resources in developing, advertising, and otherwise promoting the Trademark-in-Suit. In fact, Plaintiff has expended more than ten thousand annually in advertising, promoting, and marketing featuring the Trademark-in-Suit. Plaintiff's products have also been the subject of extensive unsolicited publicity resulting from their high quality, performance, and innovative design. As a result, products bearing the Trademark-in-Suit are widely recognized and exclusively associated by consumers, the public, and the trade as

being high-quality products sourced from Plaintiff. Plaintiff's products have become among the most popular of their kind in the U.S. and the world. The Trademark-in-Suit has achieved recognition which has only added to the distinctiveness of the marks. As such, the goodwill associated with the Trademark-in-Suit is of incalculable and inestimable value to Plaintiff.

10. Plaintiff's products are sold to consumers through Amazon, including several in the state of Illinois. Amazon is Plaintiff's primary channel for sales of products bearing the Trademark-in-Suit to consumers in the United States. Plaintiff's listings feature product content, images, and designs created by and exclusive to Plaintiff.

11. The success of the Plaintiff brands has resulted in significant counterfeiting of the Trademark-in-Suit. Consequently, Plaintiff has a worldwide anti-counterfeiting program and regularly investigates suspicious e-commerce stores identified in proactive Internet sweeps and reported by consumers. In recent years, Plaintiff has identified numerous fully interactive e-commerce stores, including those operating under the seller aliases identified in Schedule A to the Complaint (the "Seller Aliases"), which were offering for sale and/or selling unauthorized and unlicensed products, namely hair extensions, wigs, hair pieces, and braiding hair, using infringing and counterfeit versions of the Trademark-in-Suit(the "Counterfeit Products") to consumers in this Judicial District and throughout the United States.

12. I perform, and/or assist investigations related to Internet-based infringement of the Trademark-in-Suit. Our investigation shows that Defendants are using the Seller Aliases to sell Counterfeit Products from foreign countries such as China to consumers in the U.S. and elsewhere. I, or other personnel I work with, analyzed each of the e-commerce stores operating under the Seller Aliases and determined that Counterfeit Products were being offered for sale to residents in the United States, including Illinois residents. This conclusion was reached through visual inspection of the products listed for sale on each e-commerce store, the price at which the Counterfeit Products were offered for sale, other features commonly associated with e-commerce stores selling counterfeit products, and because Defendants and their e-commerce stores do not conduct business with Plaintiff and do not have the right or authority to use the Trademark-in-Suit for any reason. In addition, each e-commerce store offered shipping to the United States, including Illinois.

13. Defendants have targeted sales to Illinois residents by setting up and operating e-commerce stores that target United States consumers using one or more Seller Aliases, offer shipping to the United States, including Illinois, accept payment in U.S. dollars and/or funds from U.S. bank accounts and, on information and belief, have sold Counterfeit Products to residents of Illinois.

14. Defendants concurrently employ and benefit from substantially similar advertising and marketing strategies. For example, Defendants facilitate sales of Counterfeit

Products by designing the e-commerce stores operating under the Seller Aliases so that they appear to unknowing consumers to be authorized online retailers, outlet stores, or wholesalers. E-commerce stores operating under the Seller Aliases appear sophisticated and accept payment in U.S. dollars and/or funds from U.S. bank accounts via credit cards, Alipay, Amazon Pay, and/or PayPal. E-commerce stores operating under the Seller Aliases often include content and images that make it difficult for consumers to distinguish such stores from an authorized retailer. On information and belief, Plaintiff has not licensed or authorized Defendants to use any of the Trademark-in-Suit, and none of the Defendants are authorized retailers of genuine Plaintiff's products.

15. Many Defendants also deceive unknowing consumers by using one or more Trademark-in-Suit without authorization within the content, text, and/or meta-tags of their e-commerce stores to attract various search engines crawling the Internet looking for websites relevant to consumer searches for Plaintiff's products. Other e-commerce stores operating under Seller Aliases omit using Trademark-in-Suit in the item title to evade enforcement efforts while using strategic item titles and descriptions that will trigger their listings when consumers are searching for Plaintiff's products.

16. E-commerce store operators like Defendants commonly engage in fraudulent conduct when registering the Seller Aliases by providing false, misleading and/or incomplete

information to e-commerce platforms to prevent discovery of their true identities and the scope of their e-commerce operation.

17. E-commerce store operators like Defendants regularly register or acquire new seller aliases for the purpose of offering for sale and selling Counterfeit Products. Such seller alias registration patterns are one of many common tactics used by e-commerce store operators like Defendants to conceal their identities, the full scope and interworking of their counterfeiting operation, and to avoid being shut down.

18. Defendants are collectively causing harm to Plaintiff's goodwill and reputation because the effect of their unlawful actions taken together amplifies each harm and creates a single negative consumer impression. Defendants' activities, occurring at the same time and in the same retail space and manner as one another, blend together to create a single negative impression on consumers such that they constitute the same occurrence or series of occurrences. The combination of all Defendants engaging in the same illegal activity in the same time span causes a collective harm to Plaintiff in a way that individual actions, occurring alone, might not.

19. E-commerce store operators like Defendants are in constant communication with each other and regularly participate in QQ.com chat rooms and through websites such as sellerdefense.cn and kuajingvs.com regarding tactics for operating multiple accounts, evading detection, pending litigation, and potential new lawsuits.

20. Counterfeiters such as Defendants typically operate under multiple seller aliases and payment accounts so that they can continue operation in spite of Plaintiff's enforcement. E-commerce store operators like Defendants maintain offshore bank accounts and regularly move funds from their financial accounts to offshore accounts outside the jurisdiction of this Court to avoid payment of any monetary judgment awarded to Plaintiff.

21. Defendants are working to knowingly and willfully import, distribute, offer for sale, and sell Counterfeit Products in the same transaction, occurrence, or series of transactions or occurrences. Defendants, without any authorization or license from Plaintiff, have knowingly and willfully used and continue to use the Trademark-in-Suit in connection with the advertisement, distribution, offering for sale, and sale of Counterfeit Products into the United States and Illinois over the Internet.

22. Monetary damages cannot adequately compensate Plaintiff for ongoing infringement because monetary damages fail to address the loss of control of and damage to Plaintiff's reputation and goodwill. Furthermore, monetary damages are difficult, if not impossible, to ascertain due to the inability to calculate measurable damage in dollars and cents caused to Plaintiff's reputation and goodwill by acts of infringement.

23. Plaintiff's goodwill and reputation are irreparably damaged when the Trademark-in-Suit is used in connection with the offering for sale or sale of goods not authorized, produced, or manufactured by Plaintiff. Moreover, brand confidence is damaged,

which can result in a loss of future sales and market share. The extent of harm to Plaintiff's reputation and goodwill and the possible diversion of customers due to loss in brand confidence are largely unquantifiable.

24. Plaintiff is further irreparably harmed by the unauthorized use of the Trademark-in-Suit because counterfeiters take away Plaintiff's ability to control the nature and quality of the Counterfeit Products. Loss of quality control over goods offered for sale or sold under the Trademark-in-Suit and, in turn, loss of control over Plaintiff's reputation is neither calculable nor precisely compensable.

25. The use of the Trademark-in-Suit in connection with the offering for sale or sale of goods not authorized, produced, or manufactured by Plaintiff is likely causing and will continue to cause consumer confusion, which weakens Plaintiff's brand recognition and reputation. Consumers who mistakenly believe that the Counterfeit Products he or she has purchased originated from Plaintiff will come to believe that Plaintiff offers low-quality products. Inferior quality products will result in increased skepticism and hesitance in consumers presented with genuine Plaintiff's products, resulting in a loss or undermining of Plaintiff's reputation and goodwill. Indeed, there is damage to Plaintiff's reputation and goodwill even if a consumer knows that the goods he or she is purchasing are counterfeit. Prospective consumers who see inferior Counterfeit Products used by others may mistakenly believe such goods to be genuine and may consequently develop a poor impression of the Plaintiff brands and the

Trademark-in-Suit. Such post-sale confusion results in damage to Plaintiff's reputation and correlates to a loss of unquantifiable future sales.

26. Plaintiff is further irreparably damaged due to a loss of exclusivity. Plaintiff's products are meant to be exclusive. Plaintiff's extensive marketing and innovative designs are aimed at growing and sustaining sales. The Trademark-in-Suit is distinctive and signify to consumers that the products originate from Plaintiff and are manufactured to Plaintiff's high-quality standards. When counterfeiters use the Trademark-in-suit to offer for sale or sell goods without Plaintiff's authorization, the exclusivity of the Plaintiff brands, as well as Plaintiff's reputation, are damaged and eroded, resulting in a loss of unquantifiable future sales.

27. Plaintiff will suffer immediate and irreparable injury, loss, or damage if an *ex parte* Temporary Restraining Order is not issued in accordance with Federal Rule of Civil Procedure 65(b)(1).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 6, 2026.

Pengfei Xia

Pengfei Xia, General Manager